UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| **Terry Davis,** **Benedda Cotten**, | Case No. |
| Plaintiffs, | |
| v. | **COMPLAINT** **(WITH JURY DEMAND)** |
| **Ryan Miller, Brian Graupner,** in their individual capacities, | |
| Defendants. | |

_____

## INTRODUCTION

1.  Defendants Ryan Miller and Brian Graupner, officers in the Minneapolis Police Department, invaded the home of Plaintiffs Terry Davis and Benedda Cotten. They forced their way into the home without a warrant, without consent, and without any other constitutional justification. They terrorized Davis and Cotten while their young child looked on in tears. Davis' young son watched as Graupner shouted curse words at his father, pointed a weapon at his father, and handcuffed his father. The manifest disrespect Miller and Graupner showed for Davis's and Cotten's constitutional rights gives rise to claims under Section 1983.

1

## JURISDICTION AND VENUE

2. This Court has federal question subject matter jurisdiction because Plaintiff's claims are based on federal law.

3. Venue in this Court is proper pursuant to 28 U.S.C. § 1391, as the parties are residents of this State and District and the events giving rise to the case occurred in this State and District.

## PARTIES

4. Plaintiff Terry Davis is a resident of Minneapolis, Minnesota, who lives with his fianceé, Plaintiff Benedda Cotten.

5. Plaintiff Benedda Cotten is a resident of Minneapolis, Minnesota, who lives with her husband, Plaintiff Terry Davis.

6. Defendant Ryan Miller is an officer in the Minneapolis Police Department. At all times relevant to this case, Miller acted under color of state law.

7. Defendant Brian Graupner is an officer in the Minneapolis Police Department. At all times relevant to this case, Graupner acted under color of state law.

## FACTUAL BACKGROUND

8. During the late evening of May 3, 2019 and the early morning of May 4, 2019, Defendants Ryan Miller and Brian Graupner were on duty in their capacities as police officers for the Minneapolis Police Department.

9. Miller and Graupner were dispatched to the Phillips neighborhood in South Minneapolis in response to a 911 call from a citizen reporting loud noises and yelling in the apartment above hers.

10. As they approached the address from which the call was placed, Graupner told Miller he had responded to a call about the upper unit before and that a "gang banger" resided there.

11. This was false. Nobody in the upper unit, where Plaintiffs Terry Davis or Benedda Cotten reside, were members of any gang. In reality they were partners living in the apartment with their young children.

12. They were spending that weekend evening with their children and a nephew in their apartment.

13. Shortly after arriving at the home of Davis and Cotten, Graupner and Miller looked toward the window into their apartment, which was on the second

3

floor of a two-story house. The lights were on and they observed at least one individual spraying what they believed was a deodorizing solution.

14. Graupner and Miller saw nothing in the window that was indicative of a fight, argument, altercation, or violence of any kind.

15. All Graupner and Miller could hear from the apartment was a barking dog.

16. Graupner and Miller knocked on the main door to the house, which is shared by the apartment where Davis and Cotten lived, and the neighbor in the ground level apartment who had made the 911 call.

17. The neighbor who had made the 911 call answered the door and let Graupner and Miller into the entryway which was at the bottom of the stairs leading up to the door to the upper level apartment.

18. The neighbor briefly spoke with Miller. She told him that she had heard loud noises earlier but that it had been quiet for some time. She made no mention of a dispute or argument, or of witnessing or hearing violence.

19. Meanwhile, Graupner went up the stairs to the door to the upper level apartment where Davis and Cotten lived.

20. Graupner knocked on the door to the upper level apartment and ordered the residents to open the door while identifying himself as "police."

21. Cotten answered from behind the closed door without opening it, asking what Graupner wanted and why he was knocking on the door.

22. Graupner responded that he would force his way into the home if he had to because he was investigating "a domestic."

23. Cotten responded that Graupner had no reason to force entry.

24. Graupner responded angrily, yelling, "open the fucking door."

25. Over the next minute or so, Graupner's aggression intensified as both Cotten and Davis explained from behind the closed door that everybody in the house was fine, asked him to calm down and not yell because there were kids in the house, and told him he did not have a reason to force his way into their house.

26. Graupner was having none of it. He repeatedly threatened to kick down the door while yelling curse words and insisting that Cotten and Davis open the door.

27. During the entire time between when Miller and Graupner entered the building and when the door was opened to the apartment, there was no sign

of distress within the apartment. Nobody cried out for help and there were no sounds that indicated any violence was occurring within the apartment.

28. In fact, both Cotten and Davis spoke calmly with Graupner from behind the closed door and assured him there was no altercation taking place within the apartment.

29. Graupner willfully ignored all the evidence that there was no cause for concern and continued to threaten to break down the door while screaming curse words loud enough for the young children within the home to hear.

30. Concerned that Graupner would break down his door and that his young children were increasingly terrified by the screaming police officer, Davis felt he had no choice but to open the door to speak to him.

31. When Davis opened the door Graupner told him to "show me your hands," and then derisively called him "Joker."

32. Davis did as Graupner instructed. At all times after opening the door Davis made his hands visible to Graupner and Miller.

33. Graupner then yelled at Davis to "back up," away from the door and into the apartment, thus clearing the doorway for Graupner and Miller to enter the home.

34. Neither Davis nor Cotten ever consented to Graupner or Miller entering their home. Nevertheless, both officers entered the home.

35. As Graupner continued to shout orders at Davis to back up, both he and Miller entered the main living room area of the apartment and saw Cotten, who repeated that there was no problem in the apartment and there was no need for the police to be there.

36. Moments after Graupner and Miller entered the apartment, one of Davis's young children entered the living room crying. The child saw Graupner pointing a weapon at his father and shouting at him to back up against a wall.

37. Graupner and Miller then instructed Davis to turn around and face the wall while they put handcuffs on him, apparently in response to him questioning why they had entered his home.

38. Graupner loudly threatened to tase Davis as Davis's young child looked on, sobbing.

39. With his firearm drawn at times, Miller then went room to room to look for people, despite Cotten telling him that the only other people in the house were their children. Indeed, Miller only encountered Cotten and her children during his search.

40. Miller falsely explained to Cotten that there had been "multiple" reports of people "screaming and yelling in here."

41. As Miller searched the home, Graupner conducted a pat down search of Davis and told Miller he found a bullet in Davis's pocket.

42. Cotten continued to question why they had entered the apartment in the first place. Davis turned toward the conversation, prompting Graupner and Miller to threaten him with harm if he kept turning away from the wall.

43. At one point in the conversation Miller told Cotten "we had every right to kick the door in."

44. Around the time of Miller's comment, Graupner and Miller decided to take Davis out of the house.

45. Graupner led Davis down the stairway leading to the front door. With Davis's young child and Cotten well within earshot, Graupner called for Miller to come "help me with this fucking asshole," referring to Davis.

46. Graupner continued to curse loudly at Davis while in the stairwell and told him to "shut your mouth" when Davis questioned whether his conduct was racially motivated.

47. Cotten followed the officers out of the apartment while maintaining a safe distance between herself and them. She used her cell phone to record a video of their conduct.

48. Miller turned around and shouted at Cotten, "back up or you're going for obstruction and I'm taking your kids!"

49. Upon exiting the front door of the house, Graupner and Miller saw people on the sidewalk who were also recording the incident on their cell phones. Graupner sprayed a chemical irritant toward at least one of the onlookers.

50. As a result of this incident, Davis was kept in custody at the Hennepin County Jail for approximately four days and ultimately charged with unlawful possession of ammunition.

51. The State eventually voluntarily dismissed the charges before trial.

## COUNT I:

## UNREASONABLE SEARCH

## TITLE 42 U.S.C. § 1983 — FOURTH AMENDMENT

52. Plaintiffs incorporate the allegations set forth in each of the preceding and subsequent paragraphs as if fully set forth herein and throughout.

53. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

54. Warrantless searches are presumed to be unreasonable unless one of "a few specifically established and well delineated exceptions" applies. *Katz v. United States*, 389 U.S. 347, 357 (1967). A search occurs when a government agent seeks to obtain information by invading a person's reasonable expectation of privacy, *id.* at 360 (Harlan, J. concurring), or by trespassing upon one of the kinds of property enumerated in the Fourth Amendment, *United States v. Jones*, 565 U.S. 400, 404–05, 411 (2012).

55. The Defendants' warrantless entry into Plaintiffs' home constituted a violation of their Fourth Amendment rights. The Defendants entered into Plaintiffs' home without a warrant, without consent, and without circumstances giving rise to an exception to the Constitutional requirement for a warrant.

56. As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have been injured, suffering loss of liberty, mental and emotional pain, short- and long-term emotional injury, unlawful search, dignitary harm, discomfort, embarrassment, humiliation, fear, anxiety, apprehension,

sleeplessness, a generally diminished sense of personal and family safety, increased fear of law enforcement, attorneys' fees, the costs of bringing suit, and more.

57. Defendants, as a result of their illegal behavior, are liable to Plaintiffs for the above-mentioned injuries, as well as punitive damages.

58. Total damages suffered by Plaintiffs are to be further determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that this Court enter judgment in favor of Plaintiffs and against Defendants, as follows:

1. An order declaring that Defendants' actions and practices violated the Fourth Amendment;

2. An order declaring that Defendants' actions and practices injured Plaintiffs;

3. An order granting Plaintiffs judgment against Defendants;

4. An order granting Plaintiffs all relief available in law and equity;

5. An order granting Plaintiffs compensatory damages;

6. An order granting Plaintiffs emotional distress damages;

7. An order granting Plaintiffs liquidated damages;

8. An order granting Plaintiffs punitive damages;

9. An order granting Plaintiffs pre- and post-judgment interest;

10. An order for Defendants to pay Plaintiffs' costs, interest, and attorneys' fees;

11. An order for Defendants to pay any and all further relief available, such as any relief the Court may consider equitable and/or appropriate.

*Plaintiffs demand a jury trial.*

Dated:  July 16, 2020                              **MADIA LAW LLC**


/s/Sam Kramer
Sam Kramer, MN #400743
Joshua A. Newville, MN #395221
323 Washington Ave. N., #200
Minneapolis, Minnesota 55401
P: 612.349.2720 | F: 612.235.3357