## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

BENEDDA COTTEN and TERRY DAVIS,

                            Plaintiffs,

v.

RYAN MILLER and BRIAN GRAUPNER, *in their individual capacities*

                            Defendants.

Civil No. 20-1588 (JRT/JFD)

**MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Joshua A. Newville and Samuel Kramer, **MADIA NEWVILLE LLC**, 1850 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for plaintiffs.

Brian Scott Carter, **MINNEAPOLIS CITY ATTORNEY'S OFFICE**, 350 South Fifth Street, Room 210, Minneapolis, MN 55415, for defendants.

In the early morning hours of May 4, 2019, Plaintiffs Terry Davis and Benedda Cotten and their family, were startled by aggressive shouting from Officers Ryan Miller and Brian Graupner (collectively the "Officers") to open their door or have it kicked in. Cotten, in stark contrast to the actions of the Officers, responded in a calm tone asking why the Officers requested entry. Even though the Officers continued their hostile conduct, the Plaintiffs conferred and decided that they would comply with the Officers' request and open the door. Immediately upon Plaintiffs opening of the door and without an invitation from Plaintiffs, the Officers forced entry into Plaintiffs' home. Miller then handcuffed Davis while Graupner searched the home. Graupner, though allegedly there

to "investigate a possible domestic", conducted a quick sweep of the home, failing to talk to Cotten or the children to confirm their safety. Miller patted Davis down and discovered a live round of ammunition in his pocket. Having been provided a reason to potentially arrest Davis, the Officers left the home, making it clear that their intention in entering was not to ensure the safety of those inside, but rather to find evidence of illegal activities.

The Plaintiffs then filed a lawsuit against the Officers, alleging that the Officers' warrantless entrance into their home was a violation of their constitutional rights and, thus, the Officers are liable to them under 42 U.S.C. § 1983. The parties have brought cross-motions for summary judgment. No disputed material facts remain in the case. The Officers are not entitled to qualified immunity as their actions violated Plaintiffs' clearly established constitutional rights. Because the Officers' actions were not justified, they are liable to Plaintiffs under § 1983 for a violation of Plaintiffs' Fourth Amendment rights. As such, the Court will grant Plaintiffs' Motion for Summary Judgment.

**BACKGROUND**

I.    **FACTUAL BACKGROUND**

On May 4, 2019, the Officers were on duty with the Minneapolis Police Department. (Joint Ans., at ¶ 8, Oct. 16, 2020, Docket No. 7.) In the early morning hours, the Officers were dispatched to a duplex in South Minneapolis based on a 911 call. (*Id.* at ¶ 9.) The Officers did not hear an audio recording of the call but were instead made aware of the contents of the call through their computer system in their squad car. (Decl. Brian

Carter Supp. Defs.' Mot. Summ. J., Ex. 2 ("Incident Detail Report"), Oct. 21, 2021, Docket No. 41.)  The transmitted 911 call stated that a neighbor in the duplex heard a "verbal argument," thought "abuse" was taking place, could "hear someone being thrown around," and heard "yelling and screaming." (Incident Detail Report, at 2.)  The neighbor stated that there was a woman, her boyfriend, and a child that lived upstairs. (*Id.*)

The Officers arrived approximately ten minutes after the 911 call and activated their body-worn cameras ("BWC"). (*Id.*; Decl. Sam Kramer Supp. Pls' Mot. Summ. J. ("Kramer Decl."), Exs. P-5 ("Graupner BWC Video"), P-10 ("Miller BWC Video"), Oct. 21, 2021, Docket No. 32.)  Though not noted in his documentation following the incident, Miller claimed in his deposition that he heard voices of children while standing outside, but that the children did not sound like they were in duress and sounded playful. (Kramer Decl., Ex. A ("Miller Dep.") at 19:2–11; Kramer Decl., Ex. B ("Graupner Dep.") 65:4–8.) Graupner stated that he heard indistinguishable yelling when they arrived. (Ex. PL-15 at DEF000039[1]; Kramer Decl., Ex. B ("Graupner Dep.") at 21:21–22:5.)  The only noise that can be heard coming from the duplex on the BWC videos is the sound of a dog barking. (Graupner BWC Video at 1:50–2:00.)  Graupner also observed in the second-floor window an individual with a dew rag on spraying an aerosol can, which he inferred, based on his experience and training, was to cover the smell of marijuana. (Graupner Dep. at 50:3–19; Graupner BWC Video at 2:00–2:03.)  These observations were announced to Miller.

---

[1] The Court is using the bates number located on the exhibit.

(Graupner BWC Video at 2:00–2:03.)  Though not disclosed in his initial report, Graupner stated he smelled marijuana as he approached the duplex.  (Graupner Dep. at 50:5–11.)

As Miller approached the house, he claims he heard, but did not see, someone deadbolt the front door.  (Miller Dep. at 25:7–22.)  A noise can be heard on the video as Miller approaches the door followed by Miller stating, "Oh really?"  (Miller BWC Video at 1:40–1:50.)  Graupner did not observe the door lock, but he claims he heard the door slam in his incident report.  (Incident Detail Report at 39.)  Miller announced the Officers' presence; knocking and kicking loudly on the door.  (Miller BWC Video at 1:50–2:13.)  Eventually the 911 caller opened the door for the Officers.  (*Id.* at 2:53–3:44.)

Both Officers agreed that prior to talking to the 911 caller they did not have enough information to justify a forced entry.  (Graupner Dep. at 24:1–6; Miller Dep. at 33:24–34:7.)  Once the 911 caller opened the door, the Officers spoke with her again.  She stated that the sounds from above had ceased, but detailed how she had heard screaming, screeching, and thuds, and that what she heard was "really, really aggressive."  (Graupner Dep at 25:5–13; Miller Dep. at 30:1-15.)  She told the Officers that the voices sounded like a woman or a child and that she could not make out any of the words spoken.  (*Id.*)  Miller stated that she seemed very frightened.  (*Id*.)  She did not specifically state that there was an assault or violence going on.  (*Id.* at 54:2–10.)

At this point, Miller stated he believed that based on the information provided by the 911 caller as well as the "large lapse of time" between the call and gaining entry there

were exigent circumstances to justify a warrantless entry.  (Miller Dep. at 19:17–20:12.)
Miller approached the upper unit's front door, unholstering his service weapon and
stated, "open the door, it's the police."  (Miller BWC Video at 4:47–51.)

Cotten, who lived in the apartment, answered from behind the closed-door asking
Miller why he was there.  (*Id.* at 4:47–5:13.)  Miller responded that "I'll force entry if I
need to because I'm investigating a possible domestic."  (*Id.*)  At this point, Davis could be
heard yelling "a possible domestic, for what?"  (*Id.*)  Miller continued to loudly demand
that the door be opened, at one point directing Cotten to "open the fucking door."  (*Id* at
5:15–18.)  Cotten stated that nobody was hurt in the apartment and Davis said he just
wanted to know what brought police to their door.  (*Id.* at 5:40–51.)  Graupner then
yelled, "open the fucking door" and added that he would "kick it in."  (*Id.*)  He then again
shouted "I will kick this fucking door in."  (*Id*. at 5:51–6:02.)

Davis told the Officers they needed to calm down and eventually cracked the door
open enough to see Miller.  (*Id.* at 6:05–07.)  Miller stated "show me your hands, ya joker"
and commanded Davis to back up as Miller approached the door.  (*Id.* at 6:07–14.)  Davis
eventually did back up and the Officers entered the apartment.  (*Id.* at 6:05–21.)

Once inside the apartment, Miller pointed a taser at Davis and ordered him to back
up and face the wall.  (*Id.* at 6:21–35.)  Davis did not comply immediately with orders and
Miller had to use his hands to push Davis towards the wall.  (*Id.* at 6:20–37.)  He placed
Davis in handcuffs, but Davis' movements made it hard to put them on.  (*Id.* at 6:37–51.)

Davis continued to move while handcuffed, often turning towards Miller in spite of orders not to do so.  (*Id.*)  When this was taking place, there was a crying child in the room who Davis represented was his child.  (*Id.*)

Cotten repeatedly stated that there was no domestic and asked the police why they entered the apartment.  (*Id.* at 6:21–11:05.)  Graupner did a walkthrough of the apartment with his service firearm drawn and saw that the children in the house were unharmed.  (Graupner BWC Video at 7:35–8:19.)

While Graupner conducted a visual sweep of the apartment, Miller stayed with Davis and patted him down.  (Miller BWC Video at 7:15.)  Miller asked if Davis had any weapons on him, and Davis turned to respond to the question alarming Miller and prompting him to raise his voice, push Davis toward the wall, and yell "turn away from me."  (*Id.* at 7:25–28.)  In response to Davis making comments about recording the incident, Miller stated both "shut your mouth" and "shut up."  (*Id.* at 7:32–44.)  During the search, Miller found a live .45 caliber bullet in Davis' pocket.  (*Id.* at 8:13–14.)  Davis stated that he had been unloading Cotten's gun.  (*Id.* at 9:50–10:00).

Based on the finding of the bullet, the Officers decided to take Davis out to the squad car to determine whether he could lawfully possess ammunition.  (*Id.* at 10:10.)  Miller escorted Davis out of the apartment and requested that Graupner "come help me with this fucking asshole" when he got to the stairs.  (*Id.* at 10:30–32.)  The Officers shouted at Davis to walk down the stairs.  (*Id.* at 10:46–47.)  Cotten came up behind the

6

Officers on the stairwell with the camera on her phone recording and asked what Davis had done, to which Graupner replied "back up or you're going for obstruction and I'm taking your kids." (Graupner BWC Video at 10:57–11:03.)

The Officers took Davis outside and arrested him for unlawful possession, taking him to jail. (Graupner Dep. at 103:4–9.) The charges were later dismissed before trial. (Graupner Dep. at 86:15–20.)

The Minneapolis Police Department has protocols and procedures for responding and processing information regarding domestic violence. (Kramer Decl., Ex. P-4 at DEF001033-DEF001039.) Some of those protocols and procedures include talking to the victims and asking the victims' names. (*See, e.g.*, *id.* at DEF001037.) Here, the Officers did not comply with the MPD protocols and procedures. They never talked at length to Cotten or the children regarding potential domestic abuse and never even asked for their names. (Miller Dep. at 68:2–13.) Instead, the Officers focused solely on arresting Davis after a quick walkthrough of the Plaintiffs' residence. (*Id.*) .

Cotten filed a citizen complaint against the Officers shortly after the incident which prompted an Office of Police Conduct Review investigation. (Kramer Decl., Exs. P-3, P-9.) Graupner was not made aware of the review, nor did he face any discipline even though the report found he failed to comply with MPD policy. (Graupner Dep. at 105:14–24; Ex. P-9 at DEF000372.) Miller was subject to coaching for language that he used during the incident. (Kramer Decl., Ex. P-11.)

## II.     PROCEDURAL BACKGROUND

Plaintiffs filed the Complaint in July 2020 alleging a single count under 42 U.S.C. §

1983 for an illegal warrantless entry into their apartment.  (Compl. at ¶¶ 52-58, July 16,

2020, Docket No. 1.)  The Officers jointly answered the Complaint.  (Joint Ans.)  Each side

has moved for summary judgment.  (Pls.' Mot. Summ. J., Sept. 30, 2021, Docket No. 27;

Defs.' Mot. Summ. J., Oct. 21, 2021, Docket No. 36.)

<b>DISCUSSION</b>

## I.     STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material

fact, and the moving party can demonstrate that it is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and

a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a

verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A court considering a motion for summary judgment must view the facts in the light most

favorable to the nonmoving party and give that party the benefit of all reasonable

inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations or

denials but must show, through the presentation of admissible evidence, that specific

facts exist creating a genuine issue for trial.  *Anderson*, 477 U.S. at 256 (discussing Fed. R.

Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the plaintiff's

8

position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

## II.   ANALYSIS

The Officers assert that qualified immunity applies here, and they are, therefore, entitled to summary judgment.  The Plaintiffs disagree and instead ask the Court to grant summary judgment in their favor as no genuine disputes of material fact remain and the Officers are liable under § 1983.  As qualified immunity is a threshold matter, the Court must first undertake this analysis.

### A.  Qualified Immunity

"Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 137 S. Ct. 548, 661 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

"The determination of whether an officer is entitled to qualified immunity requires consideration of the 'objective legal reasonableness' of the officer's conduct in light of the information he possessed at the time of the alleged violation." *Winters v. Adams*, 254 F.3d 758, 766 (8th Cir. 2001) (quoting *Harlow*, 457 U.S. at 819).  The Court must assess (1) whether the facts alleged by a plaintiff constitute a violation of a constitutional or

statutory right, and (2) whether that right was clearly established at the time of a defendant's alleged misconduct. *Mitchell v. Shearrer*, 729 F.3d 1070, 1074 (8th Cir. 2013). In order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 137 S. Ct. at 551 (cleaned up). While the clearly established law must be "particularized to the facts of the case," the Court need not locate a case directly on point in order to conclude that the statutory or constitutional question is beyond debate. *Id.* at 552. Qualified immunity is a question of law for the Court to decide. *Littrell v. Franklin*, 388 F.3d 578, 584–85 (8th Cir. 2004).

### 1.  Violation of a Constitutional Right

Under the Fourth Amendment, warrantless searches and seizures are per se unreasonable subject to a few established and well-delineated exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception is the exigent circumstances exception where warrantless entry is allowed if an exigency exists. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Exigent circumstances exist in situations where (1) someone is injured or is threatened with an injury; (2) a suspect's escape is imminent; (3) evidence is at risk of imminent destruction; or (4) there is a compelling need for police action but no time to secure a warrant. *Smith v. Kansas City, Missouri Police Dep't*, 586 F.3d 576, 580 (8th Cir. 2009). Here, the only potentially relevant exigency is whether someone was injured or threatened with injury. The warrantless search must be objectively reasonable, it is irrelevant what the officer's state of mind was so long as the circumstances, when

viewed objectively, justify the search.  *Id.* at 404.  Whether entry was reasonable, then,

depends on what the officers knew at the time of entry[2] and the totality of their actions.

*Leveringston,* 397 F.3d at 1116; *United States v. Quarterman*, 877 F.3d 794, 797 (8ᵗʰ Cir.

2017).

A report of domestic abuse, alone, is not enough to create an exigent

circumstance.  *Quarterman*, 877 F.3d at 799 ("As with guns, the fact of a domestic dispute

is not necessarily enough [to constitute exigency.]"); *United States v. LaDeaux*, No. 11–

50128, 2012 WL 1609913, at *3, (D.S.D. May 8, 2012) ("[T]here is no *per se* domestic

violence exception to the warrant requirement . . . [t]he fact domestic violence occurred

---

[2] The parties dispute the point in time the Court should look to when determining reasonableness.  Plaintiffs argue that the Court must look to whether the officers had a reasonable basis to enter based on the facts known to them at the "time they made the **decision** to enter."  *United States v. Sanders*, 4 F.4th 672, 677 (8ᵗʰ Cir. 2021) (emphasis added).  The Officers contend that the Court determines reasonableness by looking at the facts known to the officers "at the time of entry."  *United States v. Leveringston*, 397 F.3d 1112, 1116 (8ᵗʰ Cir. 2005).  This distinction is important here as Miller claims he decided he would enter the Plaintiffs' home prior to ascending the stairs to the door and the Officers claim the interactions at the door contributed to creating exigency.

The Court cannot agree with Plaintiffs—*Sanders* did not drastically change the rule as Plaintiffs so claim.  Rather, the Eighth Circuit's use of the phrase "made the decision to enter" can only be interpreted, in reviewing the context of the opinion, as meaning when the police officers physically entered the home.  This is so for several reasons.  First, the Eighth Circuit in *Sanders,* after discussing the rule, goes on to analyze whether the officers were reasonable in entering the home based on all the facts they had prior to the actual entry.  *Sanders*, 4 F.4th at 677.  The distinction in *Sanders*, and likely the reason for confusion in this case, is that the officers in *Sanders* made the decision to enter the home immediately prior to physically entering the home.  *Id.*  The same is not true here.  Second, the case law cited by *Sanders* in support of this allegedly new rule does not contain any language that would indicate the focus of analysis has changed from the time of entry to the decision to enter.  Lastly, such a rule would produce absurd results, justifying a warrantless search looking only at facts known to the officer at the time they decided to enter, not all the facts known at the time of entry.

does not, in and of itself, create exigent circumstances."). Therefore, the Officers needed something more than the 911 caller's report of domestic violence to establish exigency, such as additional facts indicating violence or the threat of violence inside Plaintiffs' home.

No such additional facts exist here. First, the in-person statements from the 911 caller did not provide the Officers with any new or additional information that would support exigency. Though the 911 caller looked frightened, she was not the victim, and her fright adds no additional support for the assumption that violence was occurring inside the home. Second, the lapse in time between the call and the Officers arrival cuts against a finding of exigency considering that when the Officers arrived the 911 caller informed them that the noises had already stopped. Third, the Officers' observations upon arrival do not indicate any violence. The Officers heard children playing from the home, not crying, they smelled marijuana[3], and the Officers observed a man in a dew rag spraying an aerosol can. These facts cannot reasonably be interpreted as signs of violence or threats of violence. Fourth, the alleged dead bolting of the front door when Officers arrive does not constitute a reason to support a finding of exigency. To hold that someone who invokes their Fourth Amendment rights to privacy by locking the police out of their

---

[3] To note, the Officers made clear that the smell of marijuana did not factor into their decision to enter the home. (Graupner Dep. at 50:6–19.)

home can then be subject to a warrantless search undermines the very rights the Fourth Amendment seeks to protect.

Lastly, and most significantly, the confrontation at the door did not provide the Officers a justification to conduct a warrantless search.  When the Officers approached the door, they aggressively shouted at Plaintiffs to open it or they would kick it in.  Cotten replied to the Officers in a calm voice and did not indicate any signs of distress.  When told they were investigating a possible domestic, Cotten stated that there was no domestic occurring.  The Officers rely heavily on the fact that when Davis heard the Officers state the reasons they were there, Davis interrupted and shouted over Cotton, providing grounds for exigency as, the Officers claim, the court held in *United States v. Lawrence*.

The Court disagrees with the Officers' characterization of Davis' statements.  This was a highly charged situation, due mainly to the Officers' aggressive manner, and Davis' reaction was entirely reasonable.  He did not interrupt or speak over Cotten, and in fact, Cotten continued being the main individual to interact with the Officers after Davis made his statement.  If anything, the Plaintiffs were the ones who remained as calm as possible throughout the interaction with the Officers escalating the situation.  Davis' statement at the door would not, to any reasonable officer, indicate violence or the threat of violence. Given the totality of the circumstances known to the Officers at the time of entry, no

reasonable officer could believe that there was sufficient exigency to justify a warrantless search.

The case law supports this conclusion. In *Smith*, the Eighth Circuit held that there were no exigent circumstances even though the police officers knew there was a child inside a house with a known domestic violence suspect and the officers had personally observed injuries on a female recently caused by that suspect. 586 F.3d at 579–80. Here, the Officers did not observe any injuries or signs of violence. Further, in *LaDeaux*, the court held that there were no exigent circumstances even though the officers again observed an actual victim crying and screaming from inside the trailer because at the time of entry the victim was no longer there. 2012 WL 1609913, at *2. The Officers observed nothing at Plaintiffs' home that is even slightly similar to what the officers observed in *LaDeaux*.

The case law cited by the Officers, *United States v. Lawrence* and *Sanders*, are distinguishable. In *Lawrence*, the officers responded to a domestic violence call from the victim who was inside the home. 236 F. Supp. 2d 953, 957 (D. Neb. 2002). When police arrived, the suspect began to yell profanities at the officers, kick the door, and throw objects. *Id.* The victim opened the door, looking tearful and frightened, but promptly shut that door when the suspect told her to. *Id.* The court held this amounted to exigent circumstances. Though the Officers are correct that they need not take a potential victim's words at face value, there were no other facts akin to those in *Lawrence*, that

14

indicated violence or the threat of violence.  The potential victim did not call 911, there

was no escalation by the potential suspect, and when the potential victim spoke at the

door, she was calm.  In *Sanders*, the officers personally observed injuries on a victim who

asserted that the suspect was inside with a child.  4 F.4th at 672.  When the officers arrived

at the home, they saw the child gesturing at them through a window and crying.  *Id.*  Here,

the Officers observed no injuries on a victim and did not observe a child crying or

gesturing to them upon arrival.  Thus, *Sanders* is too dissimilar to constitute useful

guidance.

Based upon the facts known to the Officers at the time of entry, the Officers'

assertion that they had exigent circumstances to justify the warrantless search was not

objectively reasonable.  Therefore, the Officers violated the Plaintiffs' constitutional

rights under the Fourth Amendment.

### 2.  Clearly Established Right

As the Court has concluded that the Officers violated Plaintiffs' constitutional

rights when they entered their home without a warrant, the Court must next consider

whether that right was clearly established.  If not, the Officers are entitled to qualified

immunity.   A  right  is  clearly  established  when  existing  precedent[4]  places  the

---

[4] The Officers assert that the "existing precedent" standard requires that only Supreme Court precedent can clearly establish law for qualified immunity, as, they claim, the Supreme Court stated in *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021).  The Court cannot agree.  The Supreme Court did not explicitly hold this to be the rule.  Rather, the Supreme Court briefly stated, when engaging in a longer analysis, it was "assuming that Circuit precedent can clearly

constitutional or statutory question beyond debate so that a reasonable officer would know that the conduct in question was unlawful under the circumstances when it occurred. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018). The federal case law does not require a case directly on point. *White*, 137 S. Ct. at 552. A constitutional right is clearly established if its contours are sufficiently clear such that "a reasonable official would understand that what he is doing violates the right . . . in the light of preexisting law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

While admittedly the clearly established standard is a stringent one, simply because it is difficult does not mean it can never be met, as it is here. It is well established in this Circuit that a report of domestic abuse alone cannot amount to exigent circumstances. *Smith*, 586 F.3d at 580. To reiterate, in *Smith*, the Eighth Circuit held that when police officers arrived at a calm scene, even though the officers had personally observed indications of violence, including actual injuries, and they knew a child was inside with the suspect, the officers did not have exigent circumstances. *Id.* at 579–80.

---

establish law for purposes of § 1983[.]" *Id.* at 8. But this dicta does not support the rule the Officers argue for, that Circuit precedent can **never** clearly establish law. Especially when case law in the Eighth Circuit makes clear that Circuit precedent can clearly establish law. *Graham v. Barnette*, 5 F.4th 872, 887 (8th Cir. 2021). Absent clear guidance from the Supreme Court, the Eighth Circuit case law governs and precedent from the Eighth Circuit can clearly establish a constitutional right.

Absent other indications of violence or threats of violence, this Circuit has clearly established that exigent circumstances do not exist based on a report of domestic abuse.

Here, the Officers arrived at a calm scene, in fact, children could be heard playing within Plaintiffs' home.  The Officers did not personally observe any indications of violence let alone actual injuries on any person.  Furthermore, the report of domestic abuse came from a neighbor, not a victim, as it did in *Smith*.  The facts of *Smith* are sufficiently similar to clearly establish Plaintiffs' rights and to demonstrate that any reasonable officer in the Officers' shoes would have understood that what they were doing violated Plaintiffs' clearly established Fourth Amendment rights.  Thus, since not only did the Officers violate Plaintiffs' constitutional rights when they entered their home, but their rights were clearly established at the time of entry, the Officers are not entitled to qualified immunity.

### B. Community Caretaking Exception

The Officers claim that they are entitled to qualified immunity under the community caretaking exception.[5]  The community caretaking exception allows an officer to enter a home if they have reasonable belief that an emergency exists requiring their

---

[5] Defendants also claim, in brief, that the emergency aid exception to the warrant requirement constitutes another justification for the warrantless entry.  The emergency aid doctrine goes hand-in-hand with community caretaking.  *Burke v. Sullivan*, 677 F.3d 367, 371 (8th Cir. 2012).  The emergency aid doctrine allows an officer to enter a residence if they have "an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury."  *Brigham City*, 547 U.S. at 400.  But, the Court need not and will not consider this argument as it was raised for the first time in a reply brief.  *Navarijo-Barrios v. Ashcoft*, 322 F.3d 561, 564 n.1 (8th Cir. 2003).

attention.  *Quezada*, 448 F.3d at 1007.  The community caretaking functions of law enforcement must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).  The community caretaking exception has since been struck down as a standalone doctrine justifying searches and seizures by the Supreme Court.  *Caniglia v. Strom*, 141 S. Ct. 1596, 1598 (2021).  However, the Court must look to legal rules that were in existence at the time the action was taken to determine whether the Officers are entitled to qualified immunity.  *Graham v. Barnette*, 5 F.4th 872, 882 (8th Cir. 2021).  As the community caretaking exception was a standalone doctrine in May of 2019, the Court will consider it.

The community caretaking exception allows a police officer to enter a residence to help those in danger.  *United States v. Smith*, 820 F.3d 356, 360 (8th Cir. 2016).  But, the officers actions must be "totally divorced from . . . investigation[.]"  *Cady*, 413 U.S. at 441. First and foremost, the community caretaking exception cannot apply here because, at the time of entry, the Officers made it explicit that they were there to "investigate a possible domestic[.]"  (Graupner BWC at 5:10–5:12.)  Since the Officers entry was for investigative purposes, the community caretaking exception does not justify the warrantless search.

Additionally, *United States v. Smith* is distinguishable.  There, the Eighth Circuit held that the officer's warrantless entry was justified under the community caretaking

doctrine when the officer could not locate the victim, believed she was being held captive inside a home, and the officer had already removed the suspect from the home.  820 F.3d at 358–59.  Here, the Officers knew the potential victims were inside the home, had no reason to believe the potential victims were being held captive, and had yet to apprehend the alleged suspect and remove him from the home.  Thus, *Smith* provides no grounds to justify the search here.

Furthermore, the community caretaking exception does not provide support for an assertion of qualified immunity.  This rule was clearly established by both Supreme Court and Eighth Circuit precedent at the time of the Officers' entry.  *Cady*, 413 U.S. at 441; *Quezada*, 448 F.3d at 1007.

## CONCLUSION

The parties have pointed to no material facts that are genuinely disputed. Therefore, it is proper for the Court to rule on summary judgment.  Upon the undisputed material facts, it is clear that the Officers violated the Plaintiffs' constitutional rights under the Fourth Amendment when they entered Plaintiffs' home without a warrant.  The undisputed facts show that the Officers are not entitled to qualified immunity because the Plaintiffs' rights were clearly established at the time of entry.  There is no other doctrine that justifies the Officers' actions.  As such, the Court will grant the Plaintiffs' Motion for Summary Judgment and find that the Officers are liable to Plaintiffs for a

violation of their constitutional rights under 42 U.S.C. § 1983.  The issue of damages will

proceed to trial.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Plaintiffs' Motion for Summary Judgment [Docket No. 27] is **GRANTED**;

2.  Defendants' Motion for Summary Judgment [Docket No. 36] is **DENIED.**

3.  The Parties' Joint Motion For Continued Sealing [Docket No. 51] is **GRANTED in**

    **part and DENIED in part** as follow:

    a.  The parties are instructed to file redacted versions of ECF Nos. 32-1, 32-

        3, 32-5, 40, 41, and 48-1 omitting the information about third-party

        witnesses and the 911 caller;

    b.  ECF Nos. 32-1, 32-3, 32-5, 35, 35-1, 40, 41, and 48-1 shall remained

        sealed and restricted to party and court access for five years;

    c.  ECF Nos. 29, 32, 32-2, and 32-4, shall be unsealed.

    **LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: August 5, 2022
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge